# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MEKEDA WHITE, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PRESBYTERIAN MEDICAL | : | |
| CENTER OF THE UNIVERSITY OF | : | |
| PENNSYLVANIA HEALTH SYSTEM, et al., | : | NO. 20-6362 SWR |

## OPINION

Before the Court[1] are Defendants', Presbyterian Medical Center of the University of

Pennsylvania Health System d/b/a Presbyterian Medical Center and University of Pennsylvania

Health System d/b/a Penn Medicine (collectively "Defendants" or "Penn"), Motion for Summary

Judgment (doc. 19), Plaintiff's Response in Opposition thereto (doc. 23), Defendants' Reply to

Plaintiff's Response (doc. 25), and Plaintiff's Sur-Reply in Opposition to Defendants' Motion

for Summary Judgment and Reply Brief (doc. 26). For the reasons stated below, Defendants'

Motion for Summary Judgment is **GRANTED**.

## I.   INTRODUCTION

This is an employment discrimination case that arises from Plaintiff's allegations that her

employer unlawfully terminated her employment. Plaintiff alleges that her termination was

related to her mental health issues and in response to her requests for medical leave, thus

violating the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act

("ADA"), the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices

Ordinance ("PFPO"). (doc. 23 at 1). Plaintiff also alleges that Defendants were antagonistic and

---

[1] The parties voluntarily consented to proceed before me, pursuant to 28 U.S.C. § 636(c), Fed. R.
Civ. P. 72, and Local Rule 72.1. (doc. 21-22).

hostile to her following the disclosure of her mental health conditions. *Id.* Defendants deny that Plaintiff's medical conditions or requests for FMLA leave had anything to do with her termination or treatment at work and have asked this Court to grant summary judgment on all counts.

## II.    FACTUAL BACKGROUND

Plaintiff, Mekeda White, was employed by Penn as a full-time anesthesia technician from January 9, 2012 to October 7, 2020. (doc. 23, Ex. 1-A, p.2). The circumstances surrounding the termination of her employment and her requests for time off in the months preceding her termination are central to this action.

The undisputed facts are as follows: Plaintiff met with her supervisors, Javier Vasquez and Santa Iaconelli, on October 5, 2020. *See* (doc. 23-1 at 7); (doc. 25-1 at 10). During this meeting, Vasquez and Iaconelli presented Plaintiff with written discipline for insubordination on October 2, 2020. *Id; see also* (doc. 19-2 at 147). The written discipline indicated that it was Plaintiff's "Final Warning" and described the reason for the final written warning as "Insubordination and Unprofessional behavior". *Id.* The written warning explained that

> "Mekeda is receiving a final written warning for insubordination due to her unprofessional behavior exhibited on Friday, October 2, 2020… [E]xpectations for Mekeda are that she arrives to work daily prepared to perform her duties. Her blood gas card is a key component of her responsibilities as an anesthesia technician. Without her blood gas card, she cannot fully perform her duties. Mekeda should never use another employee's card. Mekeda is to exhibit and maintain a professional attitude with her manager and co-workers at all times."

*Id.* Plaintiff refused to sign the discipline because she claimed she had not engaged in the alleged conduct which formed the basis for the discipline. *See id.* (explaining "Mekeda refused to sign final warning. Claims she did not hang up. She said she would take it higher up.")

Plaintiff alleges that at some point during this meeting, she informed her managers that she intended to take FMLA leave for anxiety and depression caused by her father's recent death. (doc. 23-1 at 7). She also claims that she notified her managers that she would not be able to work her on-call shift later that night. *Id.*

Following her meeting with her supervisors, Plaintiff returned to work and completed her scheduled shift which ended around 9:30 p.m. (doc. 23-1 at 7); (doc. 25-1 at 12). Plaintiff did not appear at work later that evening for her overnight, on-call shift.(doc. 19-3, Ex. 59 to Ex. D). Defendants subsequently terminated Plaintiff's employment on October 7, 2020, citing Plaintiff's "no call no show for [her] scheduled call shift" and three previous written disciplinary write-ups. (doc. 19-2 at 157).

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.56(a). In making this determination, "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(alteration in original)(quotation marks omitted). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of the ... pleading; its response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001)(alteration in original)(quotation marks omitted).

In employment discrimination cases, the summary judgment standard "is applied with added rigor ... [because] intent and credibility are crucial issues." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997)(internal quotation marks omitted). The Third Circuit has stated that "summary judgment is... rarely appropriate in this type of case." *Marzano v. Computer Sci. Corp.Inc.*, 91 F.3d 497, 509 (3d Cir. 1996). "Simply by pointing to evidence which calls into question the defendants' intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment." *Id.* at 509–10 (internal quotation marks omitted). By contrast, "factually unsupported narratives about an employer's 'discriminatory animus' do not suffice without more." *Moore v. CVS Rx Servs., Inc.*, 142 F. Supp. 3d 321, 348-49 (M.D. Pa. 2015), *aff'd*, 660 F. App'x 149 (3d Cir. 2016).

## IV.   DISCUSSION

As noted above, Plaintiff has brought claims against Defendants under four statutes – I will address them each separately.

### A.  Family and Medical Leave Act

The FMLA provides eligible employees with 12 workweeks of leave during any 12-month period due to an employee's own or the employee's immediate family member's serious health condition. *Ross v. Gilhuly*, 755 F.3d 185, 191 (3d Cir. 2014)(*citing* 29 U.S.C. § 2612(a)(1)). "When an employee returns from FMLA leave, the employer must restore the employee to the same or equivalent position [s]he held, with equivalent benefits and with conditions of employment comparable to those [s]he had when [s]he left." *Id.* (*citing* 29 U.S.C. § 2614(a)).

"When employees invoke rights granted under the FMLA, employers may not 'interfere with, restrain, or deny the exercise of or attempt to exercise' these rights." *Lichtenstein v. Univ.*

*of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012)(*quoting* 29 U.S.C. § 2615(a)(1)).

Similarly, employers may not "'discharge or in any other manner discriminate against any

individual for opposing any practice made unlawful.'" *Id*. (*quoting* 29 U.S.C. § 2615(a)(2)).

These provisions form the basis for FMLA "interference" and "retaliation" claims. *Id*. Plaintiff

has asserted claims under both theories.

To analyze the viability of Plaintiff's claims, it is helpful to first outline the various

medical leaves that she took (or attempted to take) during her employment with Penn. Plaintiff

was approved for continuous leave for her own medical conditions from April 14, 2014 through

May 18, 2014, December 23, 2016 through March 16, 2017, April 4, 2018 through April 29,

2018, February 7, 2019 through April 7, 2019, and July 10, 2019 through July 30, 2019. (doc. 19

at 5). Plaintiff was also approved for and took continuous leave to care for her ailing father from

June 10, 2020, through August 9, 2020.[2] *See id.*

Plaintiff's final request for FMLA leave is the subject of much dispute. Plaintiff claims

she notified her supervisors that she would be taking FMLA leave during a meeting on October

5, 2020. (doc. 23-1 at 7). Defendants dispute that Plaintiff requested FMLA leave during this

meeting and instead claim Plaintiff did not make them aware of her intention to take FMLA

leave until the morning of October 6, 2020, after Plaintiff had already missed her on-call shift

---

[2] It is undisputed that Plaintiff remained out of work until August 9, 2020, but there is a question as to whether Plaintiff's FMLA leave was effective during this period of time. Plaintiff's father passed away on June 23, 2020, *see* (doc. 23-1 at 6), and Penn argues that "Plaintiff's FMLA leave to care for her father would, naturally have been discontinued." (doc. 25-1 at 7). Penn further states that Javier Vasquez, one of Plaintiff's supervisors, told Plaintiff to take all the time away from work that she needed. *Id.* Thus, Penn argues, "Plaintiff remained out of work on paid leave, but it was no longer the FMLA-approved leave to care for her father, and was well beyond the five days of leave contemplated by Penn's Bereavement Policy." *Id.*

earlier that day (doc. 25-1 at 9-10). The evidence concerning both positions will be discussed in detail below.

### 1. Retaliation

Plaintiff claims Defendants retaliated against her by terminating her employment because she requested FMLA leave on or around October 5, 2020. (doc. 23 at 6). Under the Department of Labor's regulatory interpretation "employers are barred from considering an employee's FMLA leave 'as a negative factor in employment actions such as hiring, promotions or disciplinary actions.'" *Id.* at 301 (*quoting* 29 C.F.R. § 825.220(c)). "Accordingly, an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted." *Id.* Rather, "[t]o prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 301–02 (3d Cir. 2012).

"Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. Accordingly, claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*." *Id*. at 302. Under the *McDonnell Douglas* framework, Plaintiff "has the initial burden of establishing a *prima facie* case. To do so, she must point to evidence in the record sufficient to create a genuine factual dispute about each of the three elements of her retaliation claim." *Id*. If she can establish a *prima facie* case, the burden shifts to Penn to "'articulate some legitimate, nondiscriminatory reason' for its decision." *Id.* (*quoting McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If

Penn can meet this minimal burden, Ms. White must then "point to some evidence, direct or circumstantial, from which a factfinder could reasonably...disbelieve [the employer's] articulated legitimate reasons." *Id.* ((*quoting Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)) (omission in the original).

### i.    Plaintiff Has Established a *Prima Facie* Case of Retaliation

To make out a *prima facie* retaliation claim, Plaintiff must point to some evidence in the record to show: (1) she invoked her right to take FMLA leave; (2) she suffered an adverse employment decision; and (3) the adverse decision was causally related to her FMLA leave. *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009). Penn concedes the first two elements for purposes of their Motion and argues Ms. White cannot establish that the termination of her employment was in any way causally related to her FMLA leave. (doc.19 at 15). To defeat summary judgment on causation, Ms. White "must point to evidence sufficient to create an inference that a causative link exists between her [invocation of FMLA rights] and her termination." *Lichtenstein*, 691 F.3d at 307.

A plaintiff can establish causation by showing one of the following: (1) temporal proximity between the protected activity and adverse action; (2) a pattern of antagonism after the protected act; or (3) the record taken as a whole supports an inference of retaliation. *Abdul-Latif v. County of Lancaster*, 990 F.Supp.2d 517, 530 (E.D. Pa. 2014)(*citing Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). Here, Plaintiff claims that the temporal proximity from the time of her request for FMLA leave and her termination, as well as antagonism directed to her by her supervisors after returning from FMLA leave she previously took, establish a sufficient causal connection to establish a *prima facie* retaliation claim.

"When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'" *Lichtenstein*, 691 F.3d at 307 (*quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir.2007)). Here, viewing the facts in the light most favorable to the Plaintiff, Defendants terminated Plaintiff's employment within hours of her notifying her supervisors that she would be requesting FMLA.[3] *See* (doc. 23, Ex. CC). Thus, the temporal proximity between Plaintiff's request for FMLA leave and her termination of employment is sufficient to create an inference of causality at this stage. *See Yu v. U.S. Dep't of Veterans Affairs*, 528 F.App'x 181, 185 (3d Cir. 2013)(observing that temporal proximity is generally unusually suggestive where the adverse action occurs within a few days, but no longer than a month, after the protected activity); *Hisey v. QualTek USA, LLC*, 2019 WL 3936555 (E.D. Pa. 2019)(finding eleven days between participation in protected activity and termination was sufficient to support a causal connection); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003)(retaliation ten days after protected activity was unusually suggestive).

### ii. Defendants Had a Legitimate, Nondiscriminatory Reason to Terminate Plaintiff's Employment

Having found that Plaintiff has established a *prima facie* case of FMLA retaliation, I now turn to whether Defendants have articulated a legitimate, nondiscriminatory reason for terminating Plaintiff's employment. *See McDonnell Douglas*, 411 U.S. at 802. An employer can satisfy this "relatively light burden" by "introducing evidence which, taken as true, would permit

---

[3] The timing of Defendants' termination of Plaintiff's employment is "unusually suggestive" regardless of whether Plaintiff requested FMLA leave on October 5, 2020, or October 6, 2020. The issue of when exactly Plaintiff requested FMLA leave will be addressed later in this Opinion.

the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Penn vehemently argues that Ms. White's request for FMLA leave had nothing to do with her termination and that she was terminated "because she was a no-call no-show for her on-call shift, after she had received a Final Warning consistent with Penn's PIPs Policy." (doc. 19-1 at 21). Penn's PIPs (Performance Improvement and Progressive Steps) Policy governs employee discipline and provides guidance on when and how an employee can be terminated for violations of the Policy. *Id.* at 4 (*citing* Ex. 12 to Ex. A).

Plaintiff received her first written warning per Penn's PIPs Policy on or around August 14, 2019. (doc.19-1 at Ex. 25 to Ex. A). That warning related to an altercation between Plaintiff and another employee which occurred on or about May 13, 2019.[4] *Id.* Plaintiff refused to sign the written warning because she disagreed with the discipline but never took any steps to appeal. *Id.* Less than a year later, on or about March 19, 2020, Plaintiff received a second written warning for failing to clean and restock her assigned operating rooms. (doc.19-1 at Ex. 26 to Ex. A). The second written warning included pictures of the rooms Plaintiff failed to clean and restock. *Id.* Once again, Plaintiff refused to sign an acknowledgment of her discipline, and once again, even though she apparently disagreed with the discipline, she did not appeal. *Id.* Plaintiff received her final warning before being fired on October 5, 2020, for insubordination and unprofessional behavior. (doc.19-1 at Ex. 26 to Ex. A); *see* Section I, *supra*. She then did not appear for her on-call shift on October 6, 2020. (doc.19-3, Ex. 59 to Ex. D).

---

[4] Pursuant to Penn's PIPs Policy, Plaintiff's employment could have been terminated for her conduct during this incident. *See* (doc. 19-1, Ex, 12 to Ex. A at UPENN 000276)(specifying that an employee can be terminated for a single instance of fighting or disorderly conduct).

Taken together, this evidence provides sufficient evidence to support Defendants' claim that Plaintiff was fired for her history of inappropriate behavior, insubordination, and no call/no show for her on-call shift on the morning of October 6, 2020 – all violations of Penn's PIPs Policy. These are acceptable legitimate, nondiscriminatory reasons for the purposes of the *McDonnell Douglas* analysis. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708–09 (3d Cir.1989)(providing examples of legitimate, nondiscriminatory reasons to terminate an employee's employment). The burden thus shifts to Plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably ... disbelieve the employer's articulated legitimate reasons." *Lichtenstein*, 691 F.3d at 310 (citation omitted)(omission in the original).

### iii.   Plaintiff Fails to Establish Pretext

Having found that Defendants had a legitimate, nondiscriminatory reason for terminating Plaintiff's employment, I must now examine whether Plaintiff has presented sufficient evidence to demonstrate that Defendants' proffered reason for her termination was pretextual. *Fuentes*, 32 F.3d at 763. To defeat summary judgment after an employer has established a legitimate, nondiscriminatory reason for its action, a plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative factor for the employer's action. *Id.* at 764. "[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765. "Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* (citations omitted). Moreover, the plaintiff must identify evidence in record that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 762.

Plaintiff argues that "there is an abundance of evidence from which a fact-finder could easily conclude that Defendants' alleged reason for termination is pretextual…". (doc. 23 at 11). Plaintiff points to eight such reasons to demonstrate pretext, including: (1) "[e]xtremely suspicious timing" of her termination; (2) "[a]ntagonism in the intervening period" following her father's death when Plaintiff returned from medical leave and informed her supervisors about her mental health conditions; (3) Defendants hiring of another anesthesia technician to replace Plaintiff; (4) "[b]latant disputes surrounding the alleged reason for termination"; (5) "[b]latant disputes surrounding the events Defendants claim led to Ms. White's termination"; (6) "[i]nconsistent testimony of Defendants' witnesses; (7) "Defendants' complete failure to speak with or otherwise interact [with] Ms. White about her request for FMLA leave and accommodations"; and (8) "Ms. White's attendance track record". *Id.* at 11-12.

Before examining the evidence on the record, I find it helpful to review the evidentiary standards the Court must follow at the summary judgment stage. A party opposing summary judgment "cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way." *Berckeley Inv. Group, Ltd. V. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). "The Court must only make all *reasonable inferences* in favor of [the non-moving party], not blindly adopt unsubstantiated allegations by a plaintiff as true." *Moore v. Vangelo*, 2005 WL 2178885, at *7 (E.D. Pa. 2005)(*citing Jones v. Sch. Dist. of*

*Phila.*, 198 F.3d 403, 409 (3d Cir. 1999))(emphasis in original). "[F]actually unsupported narratives about an employer's 'discriminatory animus' do not suffice without more." *Moore v. CVS Rx Servs., Inc.*, 142 F.Supp.3d 321, 348-49 (M.D. Pa. 2015), *aff'd*, 660 F.App'x 149 (3d Cir. 2016).

With these principles in mind, courts in this Circuit have held that a plaintiff cannot defeat summary judgment when she can only offer her own testimony as evidence to support her claims. *Solomon v. Soc'y of Auto Eng'rs*, 41 F.App'x 585, 586 (3d Cir. 2002)(finding the District Court properly rejected plaintiff's allegations because "the only evidence in support of these claims was [plaintiff's] own testimony"); *see also Stone v. Johnson*, 2016 WL 4037292, at *2 (E.D. Pa. 2016)(granting defendants' motion for summary judgment, where "plaintiff's arguments are either directly contradicted by the record or supported by no evidence); *Johnson v. MetLife Bank, N.A.*, 883 F.Supp.2d 542, 549 (E.D. Pa. 2012)("[A]s a general proposition, conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," and "[t]his rule has been extended to self-serving deposition testimony."). Moreover, a plaintiff's testimony alone is insufficient to rebut Defendants' explanation for her discipline and termination where her testimony is "contradicted by documentary evidence and the testimony from [her] supervisors and a human relations employee." *Ward v. Ingersoll-Rand Co.*, 2016 WL 2996769, at *5 (D.N.J. 2016), *aff'd*, 688 F.App'x 104 (3d Cir. 2017).

To summarize, Plaintiff claims there is evidence of pretext because of the timing of her termination, disputes surrounding the reason for her termination, and disputes regarding the events that led to her termination. (doc. 23-1 at 11-12). Plaintiff alleges that during a meeting on October 5, 2020, she informed her managers that she intended to take FMLA leave for anxiety and depression resulting from the loss of her father. *Id.* at 7. She also alleges that during that

same meeting, she notified her managers that she would not be able to work later that night for her scheduled, on-call shift on the night of October 5-6, 2020. *Id.* She supports these claims with only her own testimony. *See id.*

Unsurprisingly, Defendants tell a different story. Their story is supported by more than mere uncorroborated, self-serving testimony. Defendants argue that Plaintiff cannot show pretext because their decision to terminate her employment was in process before Plaintiff requested FMLA leave. According to Defendants', Plaintiff did not inform her supervisors of her intention to take FMLA leave during their October 5th meeting, nor did she notify her supervisors that she would be unable to work later that night for her scheduled, on-call shift. Defendants cite multiple emails, text messages, and testimony from Plaintiff's supervisors, to support their position.

Javier Vasquez and Santa Iaconelli both testified that they met with Plaintiff on the morning of October 5, 2020, to discuss discipline for an incident that occurred that previous Friday, October 2, 2020. *See* (doc. 23-1, Ex. GG at p.30); *Id.*, Ex. HH at p.72. There, Vasquez and Iaconelli presented Plaintiff with a written "Final Warning". *Id.* Plaintiff, disagreeing with the basis for the discipline, refused to sign the "Final Warning". *Id.* Vasquez and Iaconelli deny that Plaintiff told them she would be requesting FMLA leave[5] or that she would not be able to work later that night for her on-call shift. *See* (doc. 23-1, Ex. GG at p.35); *Id.*, Ex. HH at pp.49-

_____

[5] Defendants do not dispute that Plaintiff told Iaconelli and Vasquez that her doctor told her to "stay out," but she wanted to come back to work. *See* (doc. 25-1, Ex. 13 to Ex. C). Such a statement, however, is not equivalent to informing her managers notice that she would be unable to work her on-call shift. Moreover, such a request would not have been made in accordance to Penn's policy which requires schedule changes made with less than 24 hours' notice to be approved by management. *See* (doc. 25, Ex. 10 to Ex. A).

50. Neither party possess any sort of documentation memorializing Plaintiff's supposed requests[6]

on October 5, 2020. Plaintiff returned to work after the meeting and finished her shift which was

scheduled to end around 9:30 p.m. on October 5, 2020. (doc. 23-1 at 43); (doc 25-1 at 43).

Later that evening and into the early hours of October 6th, Iaconelli and Mark-Alan

Pizzini, another Penn employee, attempted to contact Plaintiff because Defendants needed an on-

call Anesthesia Tech to handle the volume of patients that night. *See* (doc. 19-3, Ex. K)

(evidencing Iaconelli's calls to Plaintiff on October 5th and 6th); (doc. 19-3, Ex. D. at p.55).

Plaintiff did not answer or respond to the numerous calls or text messages until 6:06 a.m. *Id.*

When Plaintiff called Iaconelli back, she stated that she had not heard her phone ring the

previous night. *See* (doc. 19-3, Ex. D at pp.58:21-59:11); *id.*, (Ex. 59 to Ex. D)(email describing

the events surrounding Plaintiff's no-call/no-show for her on-call shift). A few minutes later,

Plaintiff called Iaconelli again and informed her that she was experiencing chest pains and

dizziness. *See* (doc. 19-2, Ex. A at pp.126:8-127:20); (Ex. 59 to Ex. D).

Approximately an hour after that call, at 7:37 a.m., Plaintiff texted Iaconelli that she

was in the emergency room with chest pain and could not get up the prior evening. (doc. 19-2,

Ex. A at pp. 130:1-21); Ex. 30 to Ex. A. Two hours later, at 9:44 a.m., Plaintiff again texted

Iaconelli to let her know that she would not be in for the rest of the week and would be

requesting FMLA. *Id.*

In the time between Plaintiff's 7:37 a.m. and 9:44 a.m. text messages, Iaconelli drafted

and sent an email to Kimberley Elam, a Penn Employee Relations and Retention Specialist,

outlining the events of the previous night. (doc. 19-3, Ex. 56 to Ex. L). The email, titled "Last

---

[6] Plaintiff acknowledged that she did not follow the necessary steps to file for FMLA leave
because she didn't know how long she would need it for. *See* (doc. 23, Ex. A at p.119:14-18,
120:7-21).

night's events" describes Iaconelli's multiple attempts to reach Plaintiff shortly after midnight on October 6, 2020. *Id.* Iaconelli also explains that Mark-Alan Pizzini stayed at work until 6:00 a.m. that morning since Plaintiff was not there. *Id.* Shortly thereafter, at 10:35 a.m., Iaconelli followed up her email to Elam to explain that Plaintiff had just texted herself and Vasquez that she would not be in for the rest of the week and that she would be applying for FMLA leave. *Id.* Elam responded to Iaconelli informing her that Plaintiff's absence was "considered a no call/no show". *Id.* There is no evidence in the record to suggest Defendants terminated Plaintiff's employment because of her request for FMLA leave.

The contemporaneous documentation of the events preceding Plaintiff's termination contradict Plaintiff's claims regarding the reason she was fired. The documentation clearly supports Defendants' claims that Plaintiff was terminated for being a "no call/no show" after she had just received her "Final Warning" per the PIPs Policy. Plaintiff, on the other hand, has provided no evidence from which a factfinder could reasonably: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative factor for the employer's action. *Fuentes*, 32 F.3d at 764.

Additionally, Plaintiff argues that there is pretext because the record contains inconsistencies regarding who participated in the decision to terminate her employment. She points to Defendants' written discovery answers which state that "Javier Vasquez, Santa Iaconelli, and Kimberly Elam participated in some way in the decision to terminate Plaintiff's employment." (doc. 23, Ex. H at p.2). When Elam was asked at her deposition about who participated in the decision to fire Plaintiff, Elam testified that Chief Human Resources Manager, Marjorie Michelle, also participated in the decision. (doc. 23, Ex. II at p.29:2-9). When Vasquez

and Iaconelli were asked the same question during their depositions, they did not mention Michelle.

I see no reason why a reasonable jury could conclude the inconsistencies in answers from different individuals could create an inference of pretext regarding Defendants' decision to terminate Plaintiff's employment. When Elam testified that Michelle participated in the decision to terminate Plaintiff's employment, she explained that after speaking with Vasquez and Iaconelli about Plaintiff's potential termination, she then reported to Michelle, her boss. (doc. 23, Ex. II at p.38:10-16). She "explained to [Michelle] what had occurred, the level of discipline the employee was at and that the department wanted to move forward with a termination and [Michelle] approved it." *Id.* Thus, it is apparent why Vasquez and Iaconelli didn't mention Michelle being involved in the decision-making process – they didn't communicate with Michelle, only Elam did. Taking this into consideration, there is no reason to believe that Defendants were attempting to conceal who the real decisionmakers were or how they went about their decision. *See DeCecco v. UPMC*, 3 F.Supp.3d 337, 372-73 (W.D. Pa. 2014)(rejecting plaintiff's argument that an inconsistency regarding who made or participated in the termination decision suggested pretext because defendants were not attempting to conceal the identity of decisionmakers).

Plaintiff has failed to show that her request for FMLA leave played a role in the decision-making process which led to the termination of her employment. *See CG v. Pennsylvania Dept. of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013). When examined with the evidence, none of her arguments would allow a factfinder to reasonably believe that Penn's legitimate, nondiscriminatory reason for her termination was pretextual.

Accordingly, I will grant summary judgment in favor of Defendants as to Plaintiff's claim of FMLA retaliation.

## 2. Interference

Plaintiff also claims that Defendants interfered with her right to take FMLA leave by terminating her employment. (doc. 23 at 15). To make an FMLA interference claim[7], "an employee must show that [s]he was entitled to benefits under the FMLA and that [her] employer illegitimately prevented [her] from obtaining those benefits." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 401 (3d Cir. 2007)(*quoting Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005)). A Plaintiff must establish:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Ross*, 755 F.3d at 191-92.

Unlike an FMLA retaliation claim, "[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison v. City of Phila.*, 430 F.3d 117, 120 (3d Cir. 2005); *see Scruggs v. Carrier Corp.*, 688 F.3d 821, 825 (7th Cir. 2012)(*quoting Shaffer v. Am. Med. Ass'n*, 662 F.3d 439, 443 (7th Cir. 2011))("An [FMLA] interference claim does not require an employee to prove discriminatory intent on the part of the employer; rather, such a claim 'requires only proof that the employer denied the employee his or her entitlements under the Act.'"). Accordingly,

---

[7] The statutory basis for FMLA interference appears in 29 U.S.C. § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Department of Labor ("DOL") regulations passed pursuant to the statute state that "employers cannot use the taking of FMLA leave as a negative factor in employment actions ...." 29 C.F.R. § 825.220(c).

"[b]ecause [an FMLA interference action] is not about discrimination, a *McDonnell Douglas* burden-shifting analysis is not required." *Sommer v. Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006).

Interference claims, however, are often identical to retaliation claims and premised on the same facts and allegations that an employer took adverse action against her because she requested FMLA leave. In such cases, courts have consistently characterized interference claims as retaliation claims. *Id.* at 489; *see also McNeil v. Trustees of University of Pennsylvania*, 2019 WL 2024923, at *10 (E.D. Pa. 2019)("courts have held that dismissal of an interference claim is appropriate when the same facts provide the premise for a retaliation claim."); *Yamamoto v. Panasonic Corp.of N. Am.*, 2013 WL 3356214, at *11 (D.N.J. 2013)("[T]he interference and retaliation claims at issue here are redundant. Indeed, the premise of both claims is that Defendant wrongfully terminated Plaintiff when she returned from FMLA leave. As Plaintiff's retaliation and interference claims are duplicative, it is appropriate to dismiss the latter.")(*citing Lichtenstein*, 691 F.3d 294, 312 n.25). "The difference between the label on the claim is significant because an employer 'cannot justify [a FMLA interference action] by establishing a legitimate business purpose for its decision.'" *Atchison v. Sears*, 666 F.Supp.2d 477, 489 (E.D. Pa. 2009)(*quoting Callison v. City of Philadelphia*, 430 F.3d 117, 119-20 (3d Cir. 2005)).

In this case, Plaintiff's interference claim is based on the same facts and allegations which form the basis of her FMLA retaliation claim – that Defendants took adverse action against her because she requested FMLA leave. Thus, Plaintiff's FMLA interference allegations should be analyzed as a retaliation claim. As discussed above, Plaintiff cannot bypass the *McDonnell Douglas* analysis, and as with her retaliation claim, her interference claim must fail too. Accordingly, I will grant summary judgment as to this claim.

### B.  Americans with Disabilities Act

Plaintiff also brings claims under the ADA. She alleges that Defendants discriminated against her by terminating her employment and treating her differently because of her depression and anxiety following the death of her father. (doc. 23 at pp.16-18). Likewise, she claims that Defendants failed to reasonably accommodate her disability and that they retaliated against her for requesting such accommodations. *Id.* at 18-21.

### 1.  Discrimination

The ADA prohibits an employer from, among other things, "discriminat[ing] against a qualified individual on the basis of disability in regard to...discharge of employees...and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Plaintiff alleges that she "was subjected to a complete change in treatment from Vasquez and Iaconelli after she returned from medical leave and first informed them about her mental health conditions." (doc.23 at 18). She also claims that she was spoken to and treated in a rude manner, nitpicked, falsely accused of violating policies, and issued unwarranted discipline. *Id.* Her allegations of discrimination are supported by only her own testimony. *See* (doc.23 at p.18)(*citing* Plaintiff's Deposition Transcript).

A plaintiff asserting an ADA claim for discrimination, in the absence of direct evidence of discrimination, may proceed under the familiar burden-shifting framework of *McDonnell Douglas*. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). As discussed above, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Then, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action. *Id*. If the defendant succeeds, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for intentional discrimination. *Id*. at 804.

To establish a *prima facie* case of disability discrimination under the ADA, Plaintiff must demonstrate: (1) that she is a disabled person within the meaning of the ADA; (2) that she is otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) that she has suffered an adverse employment action that was the result of discrimination. *Taylor v. Phoenixville School Dist*., 184 F.3d 296, 306 (3d Cir. 1999).

For purposes of their Motion, Defendants do not contest the first two elements of Plaintiff's *prima facie* discrimination claim. (doc. 19, p.17, n.7). Rather, they argue that Plaintiff cannot establish the third prong of a *prima facie* discrimination claim – that she was discriminated against because of her disability. To demonstrate prima facie causation, Plaintiff must point to evidence in the record that creates an inference that a causative link exists between her disability and her termination. *Hollingsworth v. R. Home Property Management, LLC*, 498 F.Supp.3d 590, 603 (E.D. Pa. 2020)(*citing Isley v. Aker Philadelphia Shipyard, Inc.*, 275 F. Supp.3d 620, 628 (E.D. Pa. 2017)).

Plaintiff argues that the temporal proximity between the date Defendants learned of her alleged disability and the date of her termination creates an inference of discrimination. (doc. 23, pp.17-18). "Courts measure temporal proximity from the first date on which the litigant engaged in his protected activity." *Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 337 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017). Plaintiff claims that there was a 59-day gap between informing Defendants she was suffering from depression and anxiety and the termination of her employment. In this Circuit, a three-month gap or less is sufficient to infer unduly suggestive timing, and thus Plaintiff has established a *prima facie* case through temporal proximity. *See Hollingsworth*, 498 F.Supp.3d at 603; *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004).

Having established a *prima facie* case, Plaintiff now suffers from the same deficiencies that she did with her FMLA retaliation claim. *See Hollingsworth*, 498 F.Supp.3d at 613-14 (analysis of FMLA and ADA claims is the same where the same conduct forms the basis for both claims). That is, Defendants have established a legitimate, nondiscriminatory reason for terminating her employment – her repeated violations of the PIPs policy and no call/no show on October 6, 2020[8] – and Plaintiff is unable to point to any evidence in the record, other than her own testimony, to show that Defendants' reason was pretextual.

Therefore, even viewing Plaintiff's allegations in the light most favorable to her, the evidence does not support an inference of causation between Plaintiff's disability and her termination. Accordingly, I will grant Defendants' motion for summary judgment as to Plaintiff's ADA discrimination claim.

## 2. Failure to Accommodate

Next, I turn to Plaintiff's claim that Defendants failed to accommodate her alleged disability. "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor*, 184 F.3d at 306. An employer commits unlawful discrimination under the ADA if the employer does "not mak[e] reasonable accommodations to

---

[8] It is well settled that an employer is permitted to discharge an employee for misconduct, "even if that misconduct is related to [the employee's] disability." *Jeffrey v. Thomas Jefferson University Hospitals, Inc.*, 2019 WL 2122989, at *10 (E.D. Pa. 2019)(*quoting Hoffman v. City of Bethlehem*, 739 F. App'x 144, 149 (3d Cir. 2018)); *see also Willmore v. Am. Atelier, Inc.*, 72 F. Supp. 2d 526, 529 (E.D. Pa. 1999)(granting summary judgment for discrimination under the ADA in favor of the defendant where the evidence showed plaintiff was terminated for insubordination); *Monaco v. Limestone Veterinary Hosp.*, 2016 WL 304938, at *5 (D. Del. 2016)(granting the defendant summary judgment for discrimination under the ADA when the evidence showed that plaintiff failed to appear for work). Thus, to the extent Plaintiff attempts to argue that her no call/no show was related to her disability, Defendants were under no obligation to excuse such conduct.

the known physical or mental limitations of an otherwise qualified individual with a disability

who is an applicant or employee, unless [the employer] can demonstrate that the accommodation

would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C.

§ 12112(b)(5)(A); *see Taylor*, 184 F.3d at 311.

"A plaintiff bringing an ADA failure-to-accommodate claim must establish: '(1) [s]he

was disabled and [her] employer knew it; (2) [s]he requested an accommodation or assistance;

(3) [her] employer did not make a good faith effort to assist; and (4) [s]he could have been

reasonably accommodated.'" *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017)

(*citing Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F. 3d 240, 246 (3d Cir. 2006)).

Once a disabled individual requests a reasonable accommodation, it becomes the

employer's duty to engage in an "interactive process" with the individual to determine the

appropriate accommodations. *See Taylor*, 184 F.3d at 311 (*citing* 29 C.F.R. Pt. 1630, App. §

1630.9 at 359). Before getting to this point, however, the employer "must know of both the

disability and the employee's desire for accommodations for that disability." *Id.* at 313. In the

Third Circuit, "[w]hat matters under the ADA are not formalisms about the manner of the

request, but whether the employee or a representative for the employee provides the employer

with enough information that, under the circumstances, the employer can be fairly said to know

of both the disability and desire for an accommodation." *Id.* at 313. The employee bears the

initial burden of providing notice of her disability and asking for help. *Isley v. Aker Phila.

Shipyard, Inc.*, 275 F. Supp. 3d 620, 630 (E.D. Pa. 2017)(*citing Taylor*, 184 F.3d at 313).

Although Plaintiff allegedly told her supervisors about her mental health issues resulting

from her father's death, she testified that there were no accommodations she sought but did not

receive. (doc. 19-1, Ex. A at pp. 163-164). Moreover, even if Plaintiff had requested

22

accommodations during her October 5th meeting with her supervisors, Penn was not required to accommodate her disability by overlooking her past misconduct. *See Katz v. UPMC*, 2019 WL 3843041, at *8 (W.D. Pa. 2019)(*citing Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1316 (10th Cir. 2017)).

In fact, the Equal Employment Opportunity Commission states that "an employer is not required to excuse past misconduct even if it is the result of the individual's disability." *Id.*; U.S. EQUAL OPPORTUNITY EMPLOYMENT COMM'N ENFORCEMENT GUIDANCE: REASONABLE ACCOMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT AT NO. 36). The EEOC further advises:

> [i]f an employee states that her disability is the cause of the conduct problem or requests accommodation, the employer may still discipline the employee for the misconduct. If the appropriate disciplinary action is termination, the ADA would not require further discussion about the employee's disability or request for accommodation.

*Katz*, 2019 WL 3843041, at *8 (*citing* The Americans with Disabilities Act: Applying Performance and Conduct standards to Employees with Disabilities, U.S. Equal Employment Opportunity Commission (Dec. 20, 2017)). Thus, an employer is not required to terminate or forgo an ongoing disciplinary process because of a request for reasonable accommodation.

Plaintiff admits that she was not denied accommodations for her alleged disability prior to October 5, 2020. Therefore, her alleged request for time off at her October 5th meeting is the only request material to her case. However, because Plaintiff was on her "Final Warning" per the PIPs policy, and because her employment was terminated within two days of her alleged request, the Defendants had no duty to engage in the "interactive process" with her. *See Katz*, 2019 WL 3843041, at *9 ("[b]ecause Katz was terminated on February 17, 2015, eight (8) days after her alleged request for reasonable accommodation, the Defendants had no duty to engage in the

'interactive process' with her to determine what accommodations would overcome her limitations"). Plaintiff, therefore, is unable to establish a failure to accommodate claim.

Accordingly, summary judgment will be entered in favor of the Defendants as to Plaintiff's failure to accommodate claims under the ADA.

### 3. Retaliation

Plaintiff also argues that Defendants unlawfully retaliated against her by terminating her employment after she requested time off from work to deal with her mental health conditions. (doc. 23 at p. 19).

The retaliation provision of the ADA states: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter, or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co*., 126 F.3d 494, 500 (3d Cir.1997). "The burden-shifting scheme established in *McDonnell Douglas* also applies to retaliation claims." *Bernhard v. Brown & Brown of Lehigh Valley, Inc*., 720 F.Supp.2d 694, 703 n.9 (E.D. Pa. 2010).

Again, Plaintiff fails to meet her burden of showing that Defendants' proffered reasons for termination were pretextual. She provides no evidence to suggest a causal connection between her alleged disability and Defendants' termination of her employment. As discussed at length above, Defendants clearly had a sufficient basis to terminate Plaintiff by virtue of her

disciplinary history and conduct at work. Based on the facts presented, no reasonable jury could

find that Plaintiff was terminated as retaliation for requesting time off work.

Accordingly, summary judgment as to Plaintiff's retaliation claim will be entered in

favor of the Defendants.

### C.   Pennsylvania Human Relations Act and Philadelphia Fair Practices Ordinance

Plaintiff also filed claims of disability discrimination and retaliation under the

Pennsylvania Human Relations Act ("PHRA") and Philadelphia Fair Practices Ordinance

("PFPO"). These claims are closely related and are analyzed concurrently – meaning, the

resolution of Plaintiff's ADA claims also disposes of her PHRA and PFPO claims. *See Matero v.*

*Chipotle Mexican Grill, Inc*., 2018 WL 4510494, at *1 n.1, 2018 U.S. Dist. LEXIS 160716, at

*17 n.1 (E.D. Pa. 2018)("This Court has interpreted the ADA, PHRA, and PFPO to apply to

employment discrimination claims in a similar fashion."); *see also Hollingsworth*, 498

F.Supp.3d at 611 ("The PHRA is basically the same as the ADA in relevant respects and

Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts.").

Accordingly, based on my analysis of Plaintiff's ADA claims, I will also grant

Defendants' Motion for Summary Judgment for Plaintiff's claims under the PHRA.

## V.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment will be granted.

An appropriate Order follows.

BY THE COURT:

*/s/ Scott W. Reid*
SCOTT W. REID, J.
UNITED STATES MAGISTRATE JUDGE

Date: August 8, 2022